**Gibson A. HALL, Plaintiff,**

v.

**Lawrence A. McGUIGAN, Defendant.**

**Civil Action No. 97C–04–127–JOH.**

Superior Court of Delaware,
New Castle County.

Submitted: June 9, 1999.
Argued: July 23, 1999.
Decided: Sept. 10, 1999.

Joseph M. Bernstein, of Wilmington, Delaware, for plaintiff.

Mary Page Bailey, of Department of Justice, Wilmington, Delaware, for defendant.

## OPINION

HERLIHY, Judge.

This is a civil rights action for declaratory relief and monetary damages pursuant to 42 U.S.C. § 1983. Inmate Gibson A.

Hall filed a *pro se* complaint against Lawrence A. McGuigan, individually and in his official capacity as institutional investigator for the Delaware Correctional Center. Specifically, Hall seeks a declaration that McGuigan's decision to confiscate certain mail violated his First Amendment right to free speech and that he was deprived of liberty without due process of law in violation of the Fourteenth Amendment and Article I, Section 7 of the Delaware Constitution. Additionally, Hall seeks compensatory and punitive damages in specified amounts.

Before the Court is McGuigan's motion to dismiss for failure to state a claim upon which relief can be granted.[1] Because McGuigan's motion to dismiss is supported by matters outside the pleadings, this Court will treat it as a motion for summary judgment.[2] McGuigan raises three principal arguments here. First, he contends that Hall's First Amendment rights were not violated because the correspondence in question posed a security risk. Second, he argues that Hall's due process rights were not violated because adequate post-deprivation procedures were available. Finally, with regard to Hall's ability to recover money damages pursuant to § 1983, McGuigan submits that liability may not be imposed against a supervisory official merely on theory of *respondeat superior*, and that, in any event, McGuigan is

1. In May 1996, Hall was transferred to a prison facility in New Mexico from DCC. Unaware of Hall's length of stay in the New Mexico prison facility, this Court entered a stay of this case on April 2, 1998. Subsequently, this Court learned Hall was to be imprisoned for a very long time. He sought a *writ of mandamus* in the Supreme Court seeking an order lifting the stay. Joseph M. Bernstein was appointed to represent him in the Supreme Court. In an exchange of orders and correspondence with the Supreme Court, this matter was returned to this Court, the stay was lifted and McGuigan was permitted to file a motion to dismiss. The Supreme Court and this Court deemed it prudent that Mr. Bernstein continue to represent Hall and defend against McGuigan's motion. Hall has

objected to the response Mr. Bernstein filed to McGuigan's memorandum of law. Primarily, Hall objects to (1) McGuigan being allowed to now file a case dispositive motion; (2) an inability to supplement the record even at this stage and (3) Mr. Bernstein's apparent failure to argue a violation of his pre-deprivation rights. Ordinarily, this Court would not consider a party's own legal argument when represented by counsel. *In Re: Haskins*, Del. Supr., 551 A.2d 65 (1988). Hall's points, however, become moot in light of this decision.

2. *See* Superior Court Civil Rule 12(b)(6).

entitled to both sovereign and qualified immunities.

As detailed below, McGuigan's motion for summary judgment is **GRANTED**, in part, and **DENIED**, in part.

## BACKGROUND

Hall was an inmate at DCC when, in early April 1996, McGuigan confiscated mail addressed to him from NPDUM.[3] According to McGuigan, "[t]he mail was a flyer from NPDUM which contained inflammatory material including statements calling for 'the resistance of the African working class to the violent U.S. war coming down on the people' and other incitements to insurgency and rebellion."

Pursuant to DCC procedures, McGuigan sent written notice dated April 11, 1996, that the NPDUM flyer had been intercepted by prison officials.[4] The letter read:

Be advised that I am currently in receipt of correspondence addressed to you ... from NPDUM, P.O. Box 23407, Philadelphia, PA 19143. I believe that the literature contained within said parcel may violate the mail policies of [DCC] and therefore is being referred to the Attorney General's Office for an opinion.

Once I have received the requested opinion, I will advise you in writing as to the permissibility of the parcel in question.

On April 12, 1996, Hall responded with a letter to a support services officer stating:

It appears that [McGuigan] ... may have censored the literature at issue sent to me without observing the basic

procedural safeguards. At a minimum, I believe that I should have received proper *notice;* an *opportunity* to be heard; provided with a meaningful statement of reasons for the censorship; a prompt decision; and the right to appeal to an official other than the censor.

\* \* \* \* \* \*

Additionally, since ... the "sender's" property was sent to the Attorney General's Office, it appears the sender's rights may have been also violated.

[McGuigan] did not specify how the censorship furthers one or more of the substantial interests of "security, order, or rehabilitation. In fact, his action apparently was based upon *his own belief* as opposed to the well-established mail room policies.... On the mere basis of McGuigan's" belief about the literature and the action taken by him appear to be too broad and perhaps invalid.

\* \* \* \* \* \*

This letter request [sic] that you officially file it as a formal complaint and conduct an investigation and provide me with written clarification on the basis of the concerns presented to you in your official capacity as Support Services Officer responsible for mail room related concerns and problems.

A copy of that letter was sent to, among others, DCC Warden Robert Snyder. That same day, Hall lodged an official grievance raising similar concerns and requesting "a written explanation of how the literature may violate the mail policies of [DCC]; and the written copy of the opinion of the Attorney General's Office; and the correspondence confiscated."

---

**3.** The record is unclear as to what this acronym represents. Although Hall alleges that the constitutional rights of NPDUM, as the sender, were violated, they were not made a party to this action. Because Hall has no standing to seek redress on behalf of NPDUM, the Court will not further address this issue.

**4.** DCC institutional policy provides that "[t]he occurrence must be documented including the parties involved, witnesses, date of incident, date of report and signature of the reporting person."

For reasons that remain unclear, no action was taken on either the complaint or the grievance, that is, until May 1996 when Hall was involuntarily transferred to a correctional facility in New Mexico pursuant to the Interstate Compact Act, 11 *Del.C.* § 6571. At that point, it appears that the correctional authorities dropped the whole matter as moot.

## STANDARD OF REVIEW

On motion for summary judgment, the Court must inquire into the record to determine whether there are any genuine issues of material fact.[5] Summary judgment is appropriate if, after viewing the facts in the light most favorable to the non-moving party, the Court finds no genuine issue of material fact.[6] Summary judgment may not be granted, however, where a view of the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances.[7]

## DISCUSSION

### I. First Amendment Violation

Hall alleges that McGuigan's decision to confiscate certain mail violated his First Amendment right to free speech. McGuigan, on the other hand, contends summary judgment is appropriate where the record shows that the NPDUM flyer had the potential to create rebellion amongst the prisoners.

■ Unquestionably, censorship of the mails, even in the prison environment, raises legitimate First Amendment concerns.[8] The United States Supreme Court has held, however, that regulation of incoming mail in the prison context is not subject to the same strict or heightened scrutiny afforded in other First Amendment contexts.[9] Rather, the relevant inquiry is whether any such regulation is reasonably related to a legitimate penological interest.[10]

■ In this case, McGuigan was acting pursuant to DCC Institutional Policy 5.1 which provides for censorship of incoming "[m]aterials that advocate racial, religious or national hatred in such a way so as to create danger of violence in the Institution." It is important to note that Hall has not mounted a facial challenge to the institutional policy. Rather, he challenges only whether the regulation is constitutional as applied to the materials at issue and McGuigan's compliance with the regulation's procedures. The Court's review, therefore, is limited to whether McGuigan's decision to censor the NPDUM flyer was a reasonable response in light of the claimed penological objective.

As noted, McGuigan contends that his actions were reasonable because the correspondence in question posed a serious danger of violence. While the Court is mindful of the degree of broad discretion[11] that is essential to the proper discharge of a prison official's duty, McGuigan cannot merely utter the words "serious danger of violence" and expect that his actions will automatically be deemed constitutionally permissible conduct. If the Court's review is to be meaningful, there must be some

5. *Golt v. Sports Complex, Inc.*, Del.Super., 644 A.2d 989, 990 (1994).

6. *Schueler v. Martin*, Del.Super., 674 A.2d 882, 885 (1996).

7. *Tew v. Sun Oil Co.*, Del.Super., 407 A.2d 240, 242 (1979).

8. *See generally Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989).

9. *Id.* at 409–10, 109 S.Ct. at 1879, 104 L.Ed.2d at 470–71.

10. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64, 78–79 (1987).

11. *Thornburgh*, 490 U.S. at 416, 109 S.Ct. at 1883, 104 L.Ed.2d at 474–75.

burden on McGuigan to show that his actions did, in fact, promote the claimed penological objective. Any such showing should include, not only the nature of the correspondence, but also the peculiar conditions of the prison at the time of the challenged action.[12]

There is no doubt that, under the right conditions, correspondence calling for incitements to insurgency and rebellion based on racial or national biases could pose a legitimate threat of violence. For example, dissemination of material advocating insurgency may present a risk with regard to a particular reader who, being prone to violence, is likely to act accordingly. There is an additional risk that racially-charged materials will exacerbate existing racial tensions and thereby lead indirectly to disorder; the concern is that inmates will observe the material in the possession of another inmate, draw inferences about that person's beliefs and react violently.[13]

It could be that McGuigan was faced with one of these concerns, both, or perhaps other considerations which may justify his actions. The record here, however, is devoid of any evidence speaking to the conditions at DCC around this time. Absent some evidence in that regard, the Court is not satisfied that McGuigan has met his burden of showing that censorship of the NPDUM flyer promoted the claimed penological objective.

Accordingly, summary judgment is **DENIED** as to Hall's First Amendment claim.

## II. Procedural Due Process Violation

Hall alleges that he was deprived of liberty without due process of law in viola-

tion of the Fourteenth Amendment and Article 1, Section 7 of the Delaware Constitution. The basis of this allegation is twofold. First, Hall claims that he was entitled to notice and an opportunity to be heard prior to the censorship of his incoming mail. Next, he asserts that, even if he was not entitled to a pre-deprivation hearing, the post-deprivation procedures actually afforded in his case were constitutionally inadequate.

McGuigan presently seeks summary judgment as to both of these claims. Specifically, he denies that Hall was entitled to a pre-deprivation hearing. McGuigan further submits that adequate post-deprivation procedures were in place, but Hall elected not to follow them.

### A. Requirement of Pre–Deprivation Hearing

■ It is well-settled that the interest of prisoners and their correspondents in uncensored communication, grounded as it is in the First Amendment, is a liberty interest protected by the Fourteenth Amendment.[14] In *Procunier*, the Supreme Court had occasion to address the procedural safeguards required in the context of incoming prison mail. In that case, the Supreme Court affirmed a District Court's determination that an inmate was entitled to notice of the rejection of correspondence addressed to him and an opportunity to lodge complaints with a prison official other than the person who originally disapproved the correspondence.[15]

Importantly, the United States Supreme Court in *Procunier* did not have occasion to address whether pre-deprivation procedures were required. But, *Procunier* cer-

---

12. *Id.* at 417, 109 S.Ct. at 1883, 104 L.Ed.2d at 475–76.

13. *Id.*

14. *Procunier v. Martinez*, 416 U.S. 396, 417, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224, 243 (1974); *overruled on other grounds, Thornburgh*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459.

15. *Id.*

tainly suggests that pre-deprivation procedures are not required before censorship of incoming mail. In any event, prior cases dealing directly with the right to a pre-deprivation hearing serve to dispel any lingering doubt.

In certain circumstances, the United States Supreme Court has held that due process requires a pre-deprivation hearing before a state interferes with any liberty or property interest enjoyed by its citizens.[16] The Supreme Court has also held, however, that adequate post-deprivation remedies made available by a state can satisfy due process.[17] As the United States Supreme Court noted:

> [Prior] cases recognize that either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process, when coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process.[18]

■ The same justifications, *i.e.*, impracticability, coupled with meaningful post-deprivation procedures, are applicable to the present situation involving institutional security. Although it is conceivable that the State could provide a hearing before the deprivation takes place, we are dealing here with materials posing a potential threat to prison security. A requirement that these materials be disseminated until such time as Hall is afforded some type of pre-deprivation process is inconsistent to a prison official's duty to take appropriate action to maintain internal order for the protection of inmates and guards.[19] Pre-deprivation procedures are simply not practical in this context.

■ Turning to the adequacy of the post-deprivation procedures in this case, DCC Institutional Policy provides:

> 2. All mail [deemed to be in violation of DCC Institutional Policy] shall be referred to the Manger of Support Services for a decision. The inmate shall be notified by Correspondence Officer that mail is being reviewed.... A written decision shall be forwarded to the inmate. If the material is disapproved, it shall be returned to the sender or re-

16. *See, e.g., Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (driver's license and registration of an uninsured motorist could not be summarily taken without a prior hearing); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (Florida prejudgment replevin statute which allowed secured creditors to obtain writs in *ex parte* proceedings held unconstitutional).

17. *See, e.g., Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (upholding summary seizure and destruction of drugs without a pre-seizure hearing); *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947) (recognizing that the protection of the public interest against economic harm can justify the immediate seizures of property without a prior hearing when substantial questions are raised about the competence of a bank's management); *Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (upholding the authority of the Administrator of the Office of Price Administration to issue rent control orders without providing a hearing to landlords before the order or regulation fixing rents became effective); *North American Cold Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (upholding the right of a state to seize and destroy unwholesome food without a pre-seizure hearing—possibility of erroneous destruction of property was outweighed by the fact that the public health emergency justified immediate action).

18. *Parratt v. Taylor*, 451 U.S. 527, 539, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420, 431 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

19. *See Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 473 (1979) ("Prison administrators ... should be accorded a wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security").

tained along with records of the decision.

a. The Manager of Support Services shall refer mail to Security Superintendent or higher authority for determination of threat of safety of staff or inmates, security or orderly movement and progress of the Institution.

b. A decision shall be made to either release and/or withhold the item in question from inmate.

c. If a decision is made to withhold the item in question, the Manager of Support Services shall so advise the inmate in writing outlining reason(s) why and person making such a decision. Inmate will also be advised that he (inmate) has five (5) work days to appeal the decision to the Warden or his designee, or the item in question will be returned to sender or dispose [sic] of in accordance with state law.

d. If inmate protests mail rejection to the Warden or his designee of the Institution, the official making the decision of rejection of mail shall provide written rationale to the Warden when such is requested, setting out reasons for his rejection.

e. The Warden or his designee shall be afforded said mail for his perusal by the Manager of Support Services.

f. The Warden or his designee will render a written decision.

Because the DCC Institutional Policy provides for adequate notice, an opportunity to protest and the ability to appeal to a prison official rather than the person who originally disapproved the correspondence, there is little doubt that these procedures are sufficient to protect Hall's interest. And, although the record is not entirely clear, it appears that Hall had the additional option of lodging a formal grievance and entitling him to a hearing before the Resident Grievance Resolution Committee should the direct appeal prove fruitless.

Having determined that a pre-deprivation hearing is impractical, and that the existing post-deprivation procedures are adequate to protect Hall from any unnecessary deprivation, the Court concludes that a pre-deprivation hearing was not constitutionally required before the censorship of incoming mail alleged to have raised issues of institutional security.

Accordingly, summary judgment is **GRANTED** as to all claims for relief based on McGuigan's failure to provide a pre-deprivation hearing.

### B. McGuigan's Failure to Follow Post–Deprivation Procedures

■ Obviously, the mere existence of adequate post-deprivation procedures is not enough to satisfy procedural due process, if those procedures are not, in fact, followed. In this case, it is undisputed that many of DCC institutional policy procedures were not followed. Although Hall was notified that his mail was being reviewed, he was afforded none of the other procedural safeguards.

For example, Hall's mail was not referred to a higher authority within the institution for a determination of threat of safety; for whatever reason, the mail was referred directly to the Attorney General's Office. As a result, Hall was never given a written decision adequately detailing the reasons for the censorship. Furthermore, *no* action whatsoever was taken with respect to the complaint and official grievance filed in this matter. Rather, it appears that the whole matter was dropped when Hall was transferred to a correctional facility in New Mexico, a month of so after the complaint and grievance were initially filed.

■ Notwithstanding the fact that Hall filed an official grievance and a complaint with his Support Services Office, McGuigan suggests that Hall waived any

procedural rights because he did not file a complaint directly with the warden. While it may be possible for an inmate to waive entitlement to certain procedural safeguards, such as the right to appeal, this Court cannot conclude, as a matter of law, that Hall's failure to file directly with the warden amounts to a waiver of his right to appeal from McGuigan's decision. A valid waiver is an intentional relinquishment of a known right or privilege.[20] Its validity depends on the totality of the circumstances.[21]

To begin with, the record reveals that Hall sent a copy of the complaint to the warden. Moreover, DCC institutional policy does not require that all appeals be filed directly with the warden, rather, it states that an inmate "has five (5) work days to appeal the decision to the Warden *or his designee.*" At a minimum, the record to date creates a genuine issue of material fact on the question of waiver. It suggests, if anything, that there was not a waiver, since there is little evidence, if any, to support relinquishment. Because of the presence of a genuine issue of material fact, this Court cannot say on this record at this time that there was a waiver.

Accordingly, summary judgment is **DENIED** with respect to claims for relief based on McGuigan's failure to follow DCC post-deprivation procedures.

### III. Liability Under § 1983

To bring a successful § 1983 claim, Hall bears the burden of demonstrating that McGuigan, acting under the color of state law, deprived him of a constitutionally protected right.[22] In this case, it is clear that McGuigan was acting under color of state law. And, because Hall has made an adequate showing, at this stage for purposes of this motion, that McGuigan violated a constitutionally protected right, he may be entitled to monetary damages. McGuigan, however, submits that he cannot be liable for damages under § 1983.

McGuigan first submits that liability may not be imposed against a supervisory official under theory of *respondeat superior* based solely on his failure to adequately supervise or otherwise control the conduct giving rise to Hall's claims. McGuigan further asserts that the doctrine of sovereign immunity bars any claim for damages against him in his official capacity. Finally, with regard to liability in his individual capacity, he submits that he is entitled to qualified immunity.

### A. McGuigan's Vicarious Liability

 McGuigan correctly notes that a state actor in a § 1983 action cannot be held vicariously liable under the principle of *respondeat superior.*[23] Rather, the general rule is that a person who is not the moving force behind the constitutional violation escapes liability unless that person has exhibited "deliberate indifference to the plight of the person deprived." [24]

 Initially, this Court notes that it is not convinced that the liability at issue in

---

**20.** *Mazik v. Decision Making, Inc.,* Del.Supr., 449 A.2d 202, 204 (1982).

**21.** *Pellaton v. Bank of New York,* Del.Supr., 592 A.2d 473, 476 (1991).

**22.** *Parsons v. Mumford,* Del.Super., C.A.No. 95C–09–031, Ridgely, P.J., 1997 WL 819122 (November 25, 1997) at 14. Section 1983 provides that "[e]very person who, under color of [law] subjects, or causes to be subjected, an ... person within the jurisdiction [of the United States] to the deprivation of any rights ... secured by the Constitution and laws, shall be liable to the party injured in an action at law [or] suit in equity...." 42 U.S.C. § 1983.

**23.** *Durmer v. O'Carroll,* 3d Cir., 991 F.2d 64, 69 n. 14 (1993).

**24.** *Sample v. Diecks,* 3d Cir., 885 F.2d 1099, 1118 (1989).

this case falls under the rubric of "vicarious." The record to date suggests that McGuigan was, in fact, a moving force in the alleged deprivation of Hall's constitutional rights. Inasmuch as McGuigan made a determination that the materials in issue posed a serious threat of danger, a determination being challenged in Hall's First Amendment claim, it cannot seriously be contended that the liability here, if any, is based solely on his failure to adequately supervise or otherwise control the conduct giving rise to Hall's claims. And, as far as Hall's due process claim is concerned, it is McGuigan's actions (in sending the materials to the Attorney General's Office) and omissions (in failing to provide an adequate statement of reasons) that are at issue here, not those of his subordinates or even his superiors. Moreover, even if this case does implicate the actions and/or omissions of McGuigan's subordinates or supervisors, he may yet face liability because the record, when read in the light most favorable to Hall, could support a finding that McGuigan was deliberately indifferent to Hall's plight.

Accordingly, summary ground on this ground is **DENIED.**

## B. Sovereign Immunity

 To the extent that Hall seeks to hold McGuigan liable in his official capacity, McGuigan submits that sovereign immunity bars recovery. It is well settled that official capacity actions under § 1983 are treated as suits against the government entity employing the official.[25] It is also settled that a state is not a proper defendant in a § 1983 action.[26] Summary judgment is, therefore, **GRANTED** to the extent that Hall seeks to recover damages from McGuigan in his official capacity.

## C. Qualified Immunity

 Qualified immunity shields public officials performing discretionary functions from § 1983 liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [27] This requires a two-part analysis. This Court must initially determine whether McGuigan violated "clearly established" rights.[28] Next, the Court must decide whether, in light of the clearly established law in April 1996 and the information then available, a reasonable prison official would have believed that McGuigan's conduct violated Hall's constitutional rights.[29]

 It is important to note that this is an affirmative defense. Accordingly, the burden here is on McGuigan to show either that the rights involved were not "clearly established" or, if they were, that he acted reasonably. Because it appears that the regulation of incoming mail in prisons and concomitant procedure due process rights were sufficiently established at the time of the alleged violation of Hall's rights,[30] the burden in this case is on McGuigan to show that he acted reasonably. It may be that a reasonable prison official would have believed that the NPDUM flyer posed a serious risk of danger and that his actions comported with procedural due process. However, there

**25.** *Ringer v. Smith,* Del.Super., C.A.No. 93C–05–015, Ridgely, P.J., 1994 WL 750319 (November 23, 1994) at *2; *aff'd* Del.Supr., 655 A.2d 308 (1995).

**26.** *Id.*

**27.** *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396, 410–11 (1982).

**28.** *Abbott v. Latshaw,* 3d Cir., 164 F.3d 141, 148 (1998); *cert denied* —— U.S. ——, 119 S.Ct. 2393, 144 L.Ed.2d 794.

**29.** *Id.*

**30.** *Thornburgh* was decided in 1989, *Turner* in 1987 and *Procunier* in 1974.

is no evidence in the present record to support such a finding.

Because this Court cannot conclude that McGuigan acted reasonably as a matter of law, summary judgment based on qualified immunity is **DENIED**.

### CONCLUSION

Lawrence A. McGuigan's motion for summary judgment is **GRANTED** with regard to his failure to provide a pre-deprivation hearing and to the extent that Hall seeks damages from him in his official capacity. The remaining grounds for summary judgment are **DENIED**.