Dear President Rousselle:
You have requested an opinion of this Office as to the proper legal procedures to be followed in the removal of motor vehicles (largely cars and boats) that were relocated to private property by the winds and water of Hurricanes Katrina and Rita. Specifically, your concerns are:
 1) You anticipate that the Federal Emergency Management Agency (FEMA) will require assurances that the entry of local governmental officials onto private property, without prior landowner approval, to remove the motor vehicles will result in the local government's work not being reimbursable.
 2) Can the vehicles be removed from the private property without notification to either the landowner or the vehicle owner?
 3) What due process requirements must be followed in the process of removing these vehicles?
Your concerns regarding right of entry, notice, and due process have largely been addressed by previous opinions of this Office in the wake of Hurricanes Katrina and Rita. Accordingly, we have attached La. Atty. Gen. Op. Nos. 05-0360, 05-0360-A, and 05-0373 for your reference. Additionally, we direct you to the recent Executive Order, KBB-2005-71, that also addresses debris removal matters. However, we realize that vehicles may raise a few other practical matters not addressed in our previous opinions. In light of this, we undertake the brief review and analysis below.
It should be noted that this opinion covers vehicles that are not considered to be abandoned under Louisiana law. Rather, the owners of the vehicles discussed herein have simply yet to be determined. Thus, it is our opinion that the typical procedures that apply to dealing with abandoned vehicles under La. R.S.32:471 et seq. should not apply in the removal of these items from public or private *Page 2 
property. Louisiana Revised Statutes 32:471 et seq. envision the seizure of vehicles that have been intentionally abandoned and are no longer claimed by their owners. The contrary situation is in evidence in your request. According to your request, the vehicles that you are concerned about were separated from their owners by nature during the hurricanes and the owners never actually abandoned them nor did they intend to relinquish their ownership interests therein. Additionally, many of these vehicles are covered by insurance policies and there is little doubt that the insurers would want to identify these movables prior to their final disposition.
As a basic matter, vehicles are included in FEMA's general definition of debris. See FEMA, Public Assistance Policy Digest,FEMA-321, 28 (FEMA 2001); FEMA, Public Assistance Guide,FEMA-322, 45 (FEMA 1999). Thus, it is our opinion that the removal of vehicles from private property falls squarely under the debris removal advice provided by this Office in our previous opinions. See La. Atty. Gen. Op. Nos. 05-0360, 05-0360-A, and 05-0373.
As an initial matter, we note that La. R.S. 9:151 et seq.,
also known as the Uniform Unclaimed Property Act of 1997, does not apply to any of the vehicles that may be removed as debris during the cleanup process. This series of laws apply only to intangible property. Thus it is our opinion that all of the tangible things in the hurricane debris stream are excluded from the coverage of these laws. La. R.S. 9:153.
As with all of the debris located on private property that was discussed in the above cited opinions, there must be an "immediate threat" to life, public health and safety, or public or private property in order to justify the public entity's removal of the debris, including vehicles, and ensure FEMA reimbursement for this action. As we have noted in the above cited opinions, in the aftermath of Hurricanes Katrina and Rita, there is virtually no doubt that such an immediate threat exists.
Certainly then, vehicles, including but not limited to, cars and boats present a significant threat to the public health and safety as well as to the environment, necessitating their expedient removal from wherever they are located (either on public or private property). These threats include posing a safety hazard to children who might use the derelict vehicles as playgrounds, rusting automobiles representing a health hazard to those who may come into contact with them as they repopulate the devastated areas, and the damage that such debris is sure to cause to the underlying property through the leakage of hazardous fluids into the surrounding ground or water. The environmental and health hazards of these vehicles have been noted by the Louisiana Department of Environmental Quality (DEQ). DEQ,Hurricane Katrina Debris Management Plan (DEQ 2005). The hazards from automobiles include "gasoline and diesel fuel, refrigerants, *Page 3 
lubricating oils, mercury ABS switches, mercury convenience switches, lead acid batteries, brake and transmission fluid, antifreeze, and tires." Id. at 6. The hazards from boats include "gasoline and diesel fuel, refrigerants, lubricating oils, mercury bilge switches, propane tanks, large appliances, lead acid batteries, transmission fluid and electronics, such as, radar sets, radios, GPS units, and depth finders." Id. at 7.
As we discussed in La. Atty. Gen. Op. No. 05-0373 about the need to return South Louisiana to a state of normalcy in as expedient a manner as possible, it is our opinion that the removal of such vehicles from private property, in addition to advancing the health, safety, and environmental goals noted above, also substantially advances a return to normalcy for both vehicle owners and their insurers who are awaiting the identification and location of their property.
Finally, in furtherance of the goal of protecting the public's interests and thereby complying with the requirements to secure FEMA reimbursement for recovery work, we note that the expedient removal of vehicles from both public and private property to the various governmental staging areas that are processing the vehicles reduces the chance that the vehicles will be acquired by individuals who would attempt to mask the flooded or damaged nature of the vehicles and sell them as used vehicles to unsuspecting consumers. Thus it is our opinion that governmental employees' entry onto private land to remove vehicles left there by the hurricanes is well within the scope of activities sought to protect the public's interests, health, safety, and the environment. Therefore, compliance with the aforementioned opinions of this Office, as well as Executive Order KBB-2005-71, should ensure that local governments remain within the legal bounds required by FEMA for reimbursement.
One final matter that is implicit, though not stated, in your request is the matter of immunity of the local government from liability for damages caused as a result of debris operations. As was recently stated by this Office, La. R.S. 29:735
 grants general immunity to personnel of the State or any political subdivision thereof, for any actions carried out pursuant to the [The Louisiana Homeland Security and Emergency Assistance and Disaster] Act resulting in the death of, or injury to persons, or damage to property as a result of such actions.
La. Atty. Gen. Op. No. 05-0360. This notion of local immunity was supported by the recent case of Castille v. LafayetteCity-Parish Consolidated Government, 896 So.2d 1261, 2004-1569
(La.App. 3 Cir. 3/2/05), writ denied, 902 So.2d 1029,2005-0860 (La. 5/13/05), which dealt with people injured as a result of debris operations following Hurricane Lili in 2002. The court in this case found that La. R.S. 29:735(A) did immunize the City of Lafayette "from liability for *Page 4 
injuries or damages sustained as a result of the City's emergency preparedness activities." Id. at 1262. This Office is also aware of the divergent outcome of De La Cruz v. Riley,895 So.2d 589, 2004-0607 (La.App. 4 Cir. 2/2/05), writ denied,899 So.2d 581, 2005-0513 (La. 4/22/05), a case with similar facts toCastille. This case involved a fatality and injuries resulting from debris from Hurricane Georges causing an automobile accident. However, for reasons unknown to this Office, the defense of immunity was never mentioned by the municipality inDe La Cruz. Thus, although the facts are similar to Castille
and the case deals with post-hurricane debris liability, it is our opinion that the legal issues upon which the case was decided are substantially distinguishable from Castille and from the subject matter of this opinion request to make the outcome of no moment to the present matter. However, if De La Cruz can be cited for anything with respect to debris operations, it certainly stands for the notion that cleanup crews, despite their immune status, must exercise the utmost care in their debris removal activities in order to ensure the best possible protection of the lives and property of the citizens of this State.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
By: _______________________ RYAN M. SEIDEMANN Assistant Attorney General *Page 5 
 September 22, 2005
 OPINION NUMBER 05-0360
 It is the opinion of this office that, while in general, the use of
 parish equipment and labor on private property is prohibited
 by Article VII Section 14 of the Louisiana Constitution, public
 equipment and labor, which may include more than only
 parish equipment and labor in catastrophic circumstances,
Mr. Charles Tate may be used without an authorized right of entry to protect
Director of Planning the residential private property of the citizens in those areas
Governor's Office of Community Programs in southeast Louisiana that experienced such severe flooding
 that the citizens have been unable to return to their homes in
 the event of a declaration of an emergency or disaster in
 accordance with R.S. 29:721 et seq.

Dear Mr. Tate:
You have requested an opinion of the Attorney General concerning the use of public equipment and labor on private property in the midst of the worst disaster in Louisiana's history, Hurricane Katrina and its aftermath, and whether our earlier opinion in La.Atty.Gen. Op. No. 92-637 could be extended to assist in reducing the damage to private residential property.
The federal government and federal contractors are available to place plastic sheeting on those roofs of residential dwellings that have obvious holes and to remove large pieces of debris from private residential property that an individual would be unable to remove himself, such as, large trees and water-damaged cars and trucks. In addition, in this disaster the persons living in the parishes in southeast Louisiana were under a mandatory evacuation order beginning on August 25, 2005.
You specifically ask, under what circumstances can a parish utilize not only parish equipment and labor, but also other public equipment and labor under the supervision of the parish on private property in emergency or disaster situations where the residential property owner cannot be reached because of a mandatory evacuation and where the purpose of the entry on private property is to protect the residential dwelling from further damage.
Initially, as was noted in La. Atty.Gen. Op. No. 92-637, Article VII, Section 14 of the 1974 Louisiana Constitution generally prohibits the funds, credit, property or things of value of the state or any political subdivision from being loaned, pledged or donated to or for any person, association or public or private corporation. This constitutional provision recognizes certain exceptions to this general prohibition, one of which is the use of public funds for programs of social welfare for the aid and support of the needy. *Page 6 
We have also issued opinions recognizing the legality of the use of parish and/or municipal equipment and labor for the benefit of private individuals in accordance with systematic programs of financial support for the needy.
In so holding, we note that the parish or municipality should establish objective eligibility requirements to ensure that the activity truly serves only the needy. Attorney General Opinion Nos. 96-348, 94-157, 92-780, 80-115, 78-1259 and 78-1262. We now turn to the issue of emergency conditions. Article I, Section 1
of the Louisiana Constitution provides the following:
 s 1.. Origin and purpose of government
 All government, of right, originates with the people, if founded on their will alone, and is instituted to protect the rights of the individual and for the good of the whole. Its only legitimate ends are to secure justice for all, preserve peace, protect the rights, and promote the happiness and general welfare of the people. The rights enumerated in this Article are inalienable by the state and shall be preserved inviolate by the state.
We noted in La. Atty.Gen. Op. No. 92-637 a distinction should be made between the ordinary day-to-day use of parish personnel and equipment for the benefit of private individuals, and the use of these same resources to promote the general welfare of the people of this State during times of disaster and emergency. We found support for our position in R.S. 29:721 through 736 entitled, "Louisiana Emergency Assistance and Disaster Act" (Act). Section 722 enumerates the purposes for which the Act was passed, including the following:
 A. Because of the existing possibility of the occurrence of emergencies and disasters . . . resulting from . . . fire, flood, earthquake, or other natural or man-made causes and in order to ensure that preparations of this state will be adequate to deal with such emergencies or disasters, and generally to preserve the lives and property of the people of the state of Louisiana, it is hereby found and declared to be necessary:
 * * *
 (2) To confer upon the governor and the parish presidents the emergency powers provided in this Chapter.
 * * *
 (4) To reduce vulnerability of people and communities of this state to damage, injury and loss of life and property resulting from natural or man-made catastrophes. . . . *Page 7 
 (5) To prepare for prompt and efficient evacuation, rescue, care and treatment of persons victimized or threatened by disasters or emergency.
 (6) To provide a setting conducive to the rapid and orderly start of restoration and rehabilitation of persons and property affected by emergencies or disasters.
 (7) To authorize and provide for cooperation in emergency or disaster prevention, mitigation, preparedness, response, and recovery.
 Section 723 defines the following terms for purposes of the Act:
 (1) "Disaster" means the result of a natural or man-made event which causes loss of life, injury, and property damage, including but not limited to natural disasters such has hurricane, tornado, storm, flood, high winds, and other weather related events. . . .
 * * *
 (4) "Local governmental subdivision" means a parish of the state of Louisiana.
 (5) "Parish president" means the president of any parish, mayor-president, mayor of New Orleans (Orleans Parish), or police jury president.
In particular, two of these subsections in Section 722: (4) To reduce vulnerability of people and communities of this state to damage, injury and loss of life and property resulting from natural or man-made catastrophes. . . . and (6) To provide a setting conducive to the rapid and orderly start of restoration and rehabilitation of persons and property affected by emergencies or disasters, suggest that to do otherwise than to engage all possible services to protect residential private property will reduce the state's ability to protect its citizens.
Here, in the aftermath of Hurricane Katrina where much of southeast Louisiana has been evacuated and Louisiana citizens are scattered in over thirty states, it is not possible to obtain a right of entry from the authorized landowner. However, various parishes want additional help for their residential property owners, but cannot provide that assistance because the parish workers themselves are evacuees.
Here to reduce the vulnerability of people and communities of this state to damage and further loss of property from this natural catastrophe, the most prudent course of action is to permit those parishes that wish to avail themselves *Page 8 
of the services of men and equipment that other public entities can provide, including the federal government and its contractors, best serves the Constitution of Louisiana and its people.
In addition, another subsection of Section 722: (7) to authorize and provide for cooperation in emergency or disaster prevention, mitigation, preparedness, response, and recovery, we have interpreted to mean, in Op. Atty.Gen. No. 01-0204, June 21, 2001, that once a local disaster or emergency is declared by parish presidents or emergency preparedness agencies designated by them, the parish is the primary authority in dealing with local disasters or emergencies. Nonetheless, the clear and overriding intent of the legislature was for cooperative interaction between responsible public agencies. Thus, we believe it particularly appropriate to provide guidance on the use of other than parish, yet public equipment and employees and appropriate public contractors.
Section 724 provides the procedures for the declaration of an emergency or disaster by the governor. Section 727 provides the procedures for the declaration of a local disaster or local emergency by a parish president. The purpose of these declarations is to give the governor and/or the parish president the reasonable and necessary powers to carry out the provisions of the Act.
Further, Section 735 grants general immunity to personnel of the State or any political subdivision thereof, for any actions carried out pursuant to the Act resulting in the death of, or injury to persons, or damage to property as a result of such actions.
In summary, it is the opinion of this office that, while in general, the use of parish equipment and labor on private property is prohibited by Article VII Section 14 of the Louisiana Constitution, public equipment and labor, which may include more than only parish equipment and labor in catastrophic circumstances, may be used without an authorized right of entry to protect the residential private property of the citizens in those areas in southeast Louisiana that experienced such severe flooding that the citizens have been unable to return to their homes in the event of a declaration of an emergency or disaster in accordance with R.S. 29:721 et seq.
As we did in responding in La. Atty.Gen. Op. No. 92-637, I am enclosing a copy of the "Louisiana Emergency Assistance and Disaster Act" for your reference and convenience. In all cases, discretion should be exercised so that the level of the services provided are not so excessive that they constitute an unconstitutional use of public personnel and equipment. *Page 9 
We hope this response adequately responds to your inquiry, however, if we can be of further assistance, please advise.
Respectfully submitted,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 BY: __________________ WILLIAM P. BRYAN, III, *Page 10 
 OPINION NUMBER 05-0360-A
 It is the opinion of this office that, while in general, the use of
 parish equipment and labor on private property is prohibited
 by Article VII Section 14 of the Louisiana Constitution, public
 equipment and labor may be used without an authorized right
 of entry to protect the residential private property of the
Mr. Marco Rosamano citizens in those areas in southeast Louisiana that
U.S. Army Corps of Engineers experienced such severe flooding that the citizens have been
New Orleans, LA unable to return to their homes in the event of a declaration of
 an emergency or disaster in accordance with R.S. 29:721
 seq., and private property may be utilized to borrow and
 excavate for levee protection as long as the property owner
Dear Mr. Rosamano: afforded just compensation.

You have requested an opinion of the Attorney General regarding whether parish presidents' authority to commandeer private property pursuant to La. R.S. 29:727 for the temporary roofing and debris removal missions would also include the use of that same authority to grant levee boards the use of private property for emergency levee repairs, with the requisite requirements to compensate the landowner for the rights taken.
This office previously issued Opinion No. 05-0360 which found that, while in general, the use of parish equipment and labor on private property is prohibited by Article VII Section 14 of the Louisiana Constitution, public equipment and labor, which may include more than only parish equipment and labor in catastrophic circumstances, may be used without an authorized right of entry to protect the residential private property of the citizens in those areas in southeast Louisiana that experienced such severe flooding that the citizens have been unable to return to their homes in the event of a declaration of an emergency or disaster in accordance with R.S. 29:721 et seq.
We have determined that this authority would also extend to assigning right and easement to clear, borrow, excavate, and remove soil, dirt, and other materials from private property so as to perform necessary levee repair and rehabilitation prior to acquiring permission from the landowner. This would also include all necessary rights for access and temporary construction easements in order to perform this mission.
This acquisition would require that the landowner be compensated for the property at the fair market value.
This opinion incorporates all other provisions and holdings found in Opinion No. 05-0360 and simply holds that the Parish Presidents, Mayor/President, or Mayor, in the case of New Orleans, also have the power to commandeer private property *Page 11 
for use as borrow to repair and rehabilitate the levee systems prior to acquiring the landowner's permission, as long as the private land owner is justly compensated.
We hope this response adequately responds to your inquiry, however, if we can be of further assistance, please advise.
 Respectfully submitted,
 CHARLES C. FOTI, JR.
 ATTORNEY GENERAL
 BY: ______________________
 WILLIAM P. BRYAN, III,
 Assistant Attorney General
 *Page 12 
 15-A Constitutional Law
 71 Municipalities
 71-1-B Municipalities — Home Rule Charter
 74 Nuisances
 84 Parishes
 167-A Unknown Owners
 La. Const. Art. VI, Secs. 6 7
 La. R.S. 29:727 
 737 La. R.S. 33:1236, 1244, 4752
 16 USC 470f
 42 USC 5121 et seq.
 44 CFR § 206.224
 October 20, 2005 La. Atty. Gen. Op. Nos. 05-0360 05-0360-A
 OPINION NO. 05-0373
 Power exists for local governments to enter
 private land for demolition and debris removal in
Hon. Benny Rousselle an emergency situation. If local ordinances do
President, Plaquemines Parish not exist to allow for such activity, they must be
Plaquemines Parish Government created. Due process can be suspended in the
106 Avenue "G" interest of protecting the health and safety of the
Belle Chasse, LA 70037 public by demolishing hazardous structures.
 Compliance with local, state, and federal historic
 preservation laws is required, despite the
 relaxation of due process. Once the emergency
 situation abates, due process returns to normal.
 Political subdivisions may be liable for takings
Dear President Rousselle: due to demolitions.

You have requested an opinion of this Office as to the correct procedures to be followed, under the emergency situations created by Hurricanes Katrina and Rita, to ensure compliance with State law on the matter of demolition and debris removal from private property in the wake of these disasters. We are cognizant that this opinion will have far-reaching implications for all of the parishes and municipalities affected by these storms. Thus, this opinion shall first give a general review of the law in the areas of debris removal, entry onto property, and historic preservation, and then shall set forth specific guideposts upon which local governing authorities may rely in cleaning up the mess.
There is a real tension here. On the one hand, dire circumstances call for quick and decisive leadership to clean up the mess left by the hurricanes so that the rebuilding process can commence. In that sense time is of the essence. Without prompt action, there is a real danger that recovery will never occur. On the other hand, the Federal Emergency Management Administration (FEMA) requires that unless due process is afforded to victims of the Hurricane, it will not reimburse local governments for the clean up. The linchpin of this policy is to guarantee that people who have already been victimized by the natural disasters are treated fairly and even-handedly by their governments and are compensated for any taking that may occur. The irony is, however, that these requirements have the effect of bringing the entire process to a standstill. Giving notice to every landowner whose property has been impacted by the Hurricanes is impractical because, in many instances, no one knows where the landowners now live. Additionally, the cost of following state statutes or local ordinances that typically apply in condemnation/demolition situations would be unduly expensive. The central question in this instance becomes: Is there any way to relax due process requirements in a disaster to permit the recovery to begin? It is the opinion of this Office that the answer to that question is in the affirmative. The complete legal analysis of this answer is contained below. *Page 13 
We should first, however, caution that this opinion, in no way, authorizes summarily dispensing with due process requirements in an emergency or any other situation. This opinion is intended to apply only to the after-effects of these two storms. The entire purpose of this opinion is to provide a means for streamlining existing methods for conducting demolition and debris removal on private property, while maintaining as many due process protections as possible and continuing to comply with all State laws.
The information contained in this opinion does not constitute authorization on behalf of the State for haphazard or indiscriminate demolition of structures that threaten public health. Rather, this opinion should be construed as an aid to understanding the law on right of entry and debris removal as it already exists in the Louisiana statutory and jurisprudential schemes. We strongly recommend that the determination as to whether or not to demolish structures be made on a structure by structure basis. Each determination to alter or demolish structures must be undertaken with due respect and sensitivity to the rights and interests of those affected by such action. Ultimately, the final decision regarding debris removal, right of entry, and demolition rests with the local authorities.
Pursuant to the FEMA Recovery Division Policy No. 9523.13, this opinion further represents "a written opinion from the relevant State's Office of the Attorney General confirming the legal basis under state constitutional and statutory authority for the State, county and municipal governments to enter private property to perform debris removal." Id. at ¶ 7(E). Such an opinion is required by FEMA in order for certain normal condemnation and nuisance abatement procedures to be circumvented in exigent situations, as discussed more fully below. The constitutional authority derives from La. Const. Art. VI, Sec. 7 for non Home Rule Charter governmental subdivisions and from La. Const. Art.VI, Sec. 6 for Home Rule Charter governmental subdivisions (which allows the latter to create necessary laws under its Home Rule Charter).
Two previous opinions of this Office have dealt with matters concerning the placement of tarps on private property to reduce future damage and the use of private property to make emergency repairs to the levee systems in Louisiana. See La. Atty. Gen. Op. Nos. 05-0360 and 05-0360-A. This opinion is in no way intended to overrule or otherwise interfere with those opinions, but rather should be viewed as complementary to those opinions. Indeed, both of those opinions are instructive with regard to the matter that you have raised here and are discussed below, where necessary.
In the wake of the devastation unleashed upon Southeast Louisiana as a result of Hurricane Katrina, FEMA, through their Public Assistance Office, is overseeing matters related to debris removal and demolition in the affected areas. Although FEMA is overseeing these matters, the burden of actually putting the cleanup *Page 14 
process into action falls to local governments. Thus, you have asked this Office to outline the procedures necessary for local governments to authorize entry onto private property in order to facilitate debris removal and demolition. In keeping with this request, the following is a series of guidelines and legal authorities intended to aid local officials through this portion of the recovery effort.
FEMA requires strict adherence with local, state, and federal laws in order to secure reimbursement for expenses. Specifically, to be eligible for FEMA reimbursement, local governments must act in accordance with the appropriate statutory authority to enter private property for the purpose of debris removal and other activities deemed to be in the public interest. Therefore, it is necessary for local authorities to follow the guidelines contained herein before proceeding with or authorizing any activity on private property.
State of Emergency
Pursuant to State of Louisiana Proclamation Nos. 48 KBB 2005 and 54 KBB 2005, Governor Kathleen B. Blanco declared a state of emergency in the State of Louisiana. The purpose of this state of emergency, which is in effect from August 26, 2005 through October 25, 2005, is to allow governmental authorities to deal with the damage and destruction caused by Hurricane Katrina. Additionally, Governor Blanco also issued Louisiana Proclamation No. 53 KBB 2005, which implements a state of emergency as a result of Hurricane Rita and lasts from September 20, 2005, until October 20, 2005.
In order to effectively respond to this State of Emergency and the State of Emergency declared by President Bush, FEMA has issued a Hurricane Katrina specific policy for debris removal from private property. FEMA Recovery Division Policy No. 9523.13. This policy was issued on September 7, 2005. The policy provides guidance on the appropriate use of funding, as provided for in the Stafford Act, 42 USC 5121 et seq., for debris removal and disposal, including demolition of unsafe structures from private property in areas affected by Hurricane Katrina. According to FEMA regulations implementing Sections 403 and 407 of the Stafford Act (42 USC 5170b 5173), specifically44 CFR § 206.224, in order to be eligible for reimbursement debris removal must be in the "public interest." "Public interest" is defined as being necessary to:
 (1) eliminate immediate threats to life, public health, and safety; or
 (2) eliminate immediate threats of significant damage to improved property; or
 (3) ensure economic recovery of the affected community to the benefit of the community at large. *Page 15 Id. "FEMA will work with each State to designate those areas where the debris is so widespread that removal of the debris from private property is in the "public interest" under 44 C.F.R. § 206.224
and thus, eligible for FEMA reimbursement." FEMA Recovery Division Policy No. 9523.13, ¶ 2A.
The debris removal may very well require the complete demolition of a private structure in order to ensure the protection of public health and safety. However, we caution that the demolition of structures should be a last resort in the recovery process, only used when no other option is available. Additionally, to the extent that private owners can be identified and located in a timely manner, we urge the local authorities to secure waivers of right-of-entry, debris removal, and demolition from them. However, in light of the reality that substantial portions of the population of South Louisiana has been scattered among nearly all of the fifty United States, the following analysis provides for methods whereby local authorities can expedite the debris removal and demolition process while continuing to comply with the law.
Demolition, Debris Removal, and Right of Entry Issues
Basically, in order to comply with FEMA regulations, debris removal and entry onto private property must be accomplished according to established municipal ordinances. FEMA, PublicAssistance Debris Management Guide, 35 (FEMA 1999). This basic tenet raises two major problems: (1) many of the localities affected by Hurricanes Katrina and Rita may not have municipal ordinances that grant them a right-of-entry onto private property or assist in expediting the demolition or debris removal process for the purposes of abating or removing public health or safety hazards or to mitigate imminent threats to property; (2) where such ordinances do exist, they are often burdened with time delays for notice and other due process matters that would substantially hamper the necessary expediency of recovery efforts in the wake of the hurricanes.
Speaking directly to the issue of debris removal or property demolition, the Louisiana jurisprudence provides ample support for municipal activity undertaken in the best interests of the general public that would otherwise constitute a taking if not occurring during an emergency situation. In 1882, the Louisiana Supreme Court noted, with respect to the police power, that,
 [t]here are cases where it becomes necessary for the public authorities to interfere with the control by individuals, of their property, and even to destroy it, when the owners themselves have fully observed all their duties to their fellows and to the State, but where, nevertheless, some controlling public necessity demands the interference or destruction. Strong instances exist where it *Page 16 
becomes necessary to take, use or destroy the private property of individuals, to prevent the spreading of a fire, the ravages of pestilence, the advance of a hostile army, or any other great public calamity.
Bass v. State of Louisiana, 34 La. Ann. 494 (1882) (emphasis added). This case has also been cited in more recent Louisiana Supreme Court cases as authority for justifying takings without compensation. See Avenal v. State, 886 So.2d 1085, 1106 (La. 2004). Thus, it is well settled that the activities of debris removal and demolition contemplated by the local governments supercede the interests of individual citizens during this state of emergency as the activities are in the best interests of the people. See also, Givens v. Town of Ruston, 55 So.2d 289
(La.App. 2 Cir. 1951). As has been shown, legal precedents support the suspension of due process in exigent circumstances, however, there is no guarantee that this authority to suspend due process insulates municipalities from lawsuits for takings of private property.
Although we have identified the authority to enter private property and to, if necessary, alter or demolish it, there are still formal FEMA requirements that must be followed in order to ensure that the local governments will be reimbursed for their expenditures.
Situations Where Local Ordinances Do Not Contain NecessaryLaw
In situations where no such municipal ordinances exist that would grant a right-of-entry or a right to demolish, local laws cannot be followed because no law exists, making compliance with FEMA requirements impossible. Therefore, in instances where local ordinances have not already been enacted, the local governing authority must create them before reimbursable work can commence. The Louisiana Revised Statutes provide a mechanism for the creation of such new ordinances.
Title 33 of the Louisiana Revised Statutes provides for the relative powers of local governments. The legislature enacted La. R.S. 33:1236 which defines the powers of local governing authorities. Several of the sections of this title deal with the authority of police juries and other local governing authorities to enact ordinances prohibiting public nuisances, specifically — regulating unhealthful growths, trash, debris, refuse, or discarded or noxious matter, and trash and debris, and relating to the repair and condemnation of buildings, dwellings, and other structures that have become derelict and present a danger to the health and welfare of residents. Louisiana Revised Statutes33:1236(21) and 33:1236 (49) are of import to the legal issues involved in the removal of debris from private property and the condemnation of buildings which pose a threat to public *Page 17 
health and safety. They also give the local governing authorities the power to enact ordinances regulating both debris removal from private property and the condemnation and demolition of structures for public health and safety reasons.
Keep in mind that the provisions contained in La. R.S. 33:1236
are parish-specific (different paragraphs of 1236 give certain parishes specific powers relating to that parish), and do not apply to Orleans Parish. La. R.S. 33:1244. Local authorities of Orleans Parish should look to La R.S. 33:4752 for provisions on the removal of dangerous structures in their parish.
Thus, pursuant to the authority granted by the Legislature in La. R.S. 33:1236, affected parishes may create ordinances that allow for right-of-entry for the above-mentioned purposes. Alternatively, La. R.S. 29:737 likely grants municipal chief executive officers the authority to issue orders "to preserve the public peace, property, health, or safety within the municipality." Under this authority, it may be possible for the municipal chief executives to issue orders accomplishing the same goals as the above discussed ordinances. However, because of the vague nature of this statute with respect to such powers, this Office is of the opinion that the above discussed approach for creating municipal ordinances is a more secure method of ensuring compliance with the law to assure FEMA reimbursement.
This Office recommends that such ordinances or orders be narrowly tailored to fit the specific needs of the local government for the effects of Hurricanes Katrina and Rita so as to minimize the use of what would be a substantial impairment of due process rights under nonemergency conditions. Additionally, in enacting such ordinances, the governing authorities of the affected local governments must comply with the standard laws and practices for the creation of ordinances. Failure to so comply could result in the federal government's declaring local ordinances invalid. This, of course, would thwart the attempts of local governments to obtain FEMA reimbursement for their work later.
Situations Where Local Ordinances Do Contain Necessary Law
In the interest of expediency, we have not undertaken an extensive review of each affected parish's local ordinances to determine which ones do and which ones do not contain the necessary language to allow a right of entry. We leave this task to the local governments who are more familiar with and can more easily navigate their own laws. Nevertheless, there will likely be instances where local ordinances do contain some language that would permit government agents or their designees to enter private property. In instances where such authority may exist, there are still concerns about providing due process to the affected landowners if their property is to be substantially altered or demolished in order to protect the public health and safety. *Page 18 
The suspension of constitutional requirements, as imbedded and reflected in local ordinances, must be addressed here as well. First, if ordinances do exist that are sufficient to satisfy the reimbursement requirements of FEMA, then the notice and due process delays must be circumvented. The reason for circumventing these due process protections is simple: Considering the scattering of South Louisiana's population across the United States, it would be impossible to provide adequate notice to affected landowners before entering or altering their private property. Indeed, FEMA, in Policy No. 9523.13, ¶ 7B, recognizes that such circumstances exist in certain areas in South Louisiana, making compliance with the normal condemnation and abatement procedures impractical.
In order to return the affected areas to some semblance of normalcy and or operability, it is necessary that debris removal and health-hazard abatement begin post haste. In the interests of accomplishing these goals, it would be impractical, if not completely impossible, to comply with the typical due process requirements associated with right of entry and/or condemnation proceedings. As a basic notion, the law does not require anyone to perform vain and useless acts. See e.g., Moore v. St. PaulFire and Marine Insurance Company, 251 La. 201, 203 So.2d 548
(La. 1967). Attempts to contact all of the affected, displaced residents of South Louisiana in order to gain right of entry waivers or to provide them with notice and hearing, or both, before the removal of debris from their property would indeed represent a vain effort on behalf of the local governments and would unduly hamper recovery efforts. Thus, it is our opinion that such measures must be circumvented.
Persuasive legal authority from various jurisdictions around the country exists that support the ability of a governmental entity to bypass the due process requirements of notice and hearing in the wake of a natural disaster. By FEMA's own admission, it is not always possible to obtain the necessary waivers prior to commencing such work. See FEMA, supra, at 36. In such instances, FEMA recommends that local authorities document their reasons for not obtaining such waivers. Id.
The most notable case that allows for the suspension of due process requirements under emergency circumstances is NorthAmerican Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101
(1908). In North, the Court held that if a public health hazard justifies immediate action, governmental actors can bypass the need for preaction hearings to vet out the interests of the interested parties. Although this decision dealt with movable property, the scenario is analogous to the situation in South Louisiana where the potential threat to public health caused by hazards contained in private property necessitates a quick response that may be hampered in the likely event that the private owners may *Page 19 
not be servable or even locatable for some time, owing to the circumstances of the hurricane evacuations. Similarly, in Hallv. McGuigan, 743 A.2d 1197 (1999), the Delaware Superior Court found that if following due process procedures prior to a taking was impractical due to exigent circumstances, the application of these procedures on a post-hoc basis was sufficient. See also,Srb v. Board of County Com'rs, Larimer County, 601 P.2d 1082
(1979). These cases stand for the premise that, even in situations where compensation may be necessary, the notice and comment period may be suspended until after the debris removal or demolition has occurred and the emergency has abated. More to the point, the Ninth Circuit Court of Appeals has stated that, "Summary governmental action taken in emergencies and designed to protect the public health, safety and general welfare does not violate due process." Armendariz v. Penman, 31 F.3d 860, 866
(1994). See also, Hodel v. Virginia Surface Mining ReclamationAss'n, 452 U.S. 264, 299-300, 101 S.Ct. 2352, 2372-73 (1981);U.S. v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200
(1952); Customer Co. v. City of Sacramento, 10 Cal.4th 368 (Cal. 1995); Miller v. Campbell County, Wyo., 722 F.Supp. 687
(D.Wyo. 1989); Rose v. City of Coalinga, 190 Cal.App.3d 1627
(Cal.App. 5 Dist. 1987).
Under Title 29, specifically section 727, of the Louisiana Homeland Security and Emergency Assistance and Disaster Act, the parish president has the power to suspend the provisions of any regulatory ordinance if strict compliance with the provisions of any ordinance would in any way prevent, hinder, or delay necessary action in coping with an emergency.[1] Using the powers given to the parish president under Title 29, the governments may suspend notice and hearing requirements found in existing ordinances in order to respond to the immediate need for action and the difficulty in locating property owners in the affected parishes.
The cases noted above clearly provide for a suspension of due process and notice requirements in the event of a natural disaster. Additionally, the states of emergency declared by Governor Blanco further add to the immediacy for rapid responses to public health and safety hazards. In light of the foregoing, and the authority vested in parish presidents via Title 29, in local governments where ordinances exist for right of entry and demolition/debris removal from private property, we recommend that the parish presidents issue an executive order that suspends notice and due process rights related to these matters. We caution that such a suspension should be narrowly tailored to meet the immediate needs of the Hurricane Katrina and Rita recovery and that it should be set to expire within a reasonable time. *Page 20 
 Compliance with Historic Preservation Laws
History-related tourism is the lifeblood of many South Louisiana communities. During the reconstruction process it is incumbent upon the local governments to ensure the protection of historic and archaeological resources for future research and education as well as to help bring tourists back to our area once we have recovered from this disaster. Despite the power of certain local governments to suspend their local historic preservation ordinances in order to "expedite" the recovery process, this does not eliminate the requirement that these entities must continue to comply with state and federal preservation laws and regulations. Section 106 of the National Historic preservation Act (16 USC 470f) requires FEMA, in consultation with the State Historic Preservation Office, to identify properties eligible for or listed on the National Register of Historic Places (NRHP) and to adequately consider the effect of any FEMA funded undertaking, including potential demolition of private and public property, on identified historic properties. FEMA's historic preservation responsibilities must be fulfilled before FEMA funded activities can be initiated. If an applicant for FEMA assistance proceeds with an undertaking before FEMA satisfied these requirements, FEMA funding may be jeopardized. Therefore, it is the opinion of this Office that local governments should not summarily suspend or abolish their local historic preservation boards or commissions. Rather, in order to expedite the notice and hearing process associated with how to deal with badly damaged historic properties, we would suggest issuing an ordinance or proclamation that streamlines this process. This approach is more prudent than eliminating the process altogether, and thereby potentially jeopardizing FEMA reimbursement funding if a NRHP eligible structure or site is damaged or altered in the cleanup process.
Opinion Summary
As we noted at the beginning of this opinion, we are faced with a real tension in the aftermath of these storms: One the one hand, there is an obligation to protect the due process rights of the individuals in the affected areas while, on the other hand, the State and its political subdivisions must be able to move forward with the rebuilding process in order to make South Louisiana habitable and economically viable again. In light of this tension, we believe that the foregoing analysis provides a solution that walks the fine line between the competing interests of due process and recovery. This analysis is summarized as follows:
 (1) Power does exist for local governments to enter private land for demolition and debris removal in an emergency situation. This power is granted by the Louisiana Constitution and a line of court cases, including authority from the United States Supreme Court. *Page 21 
 (2) If no local ordinances exist to allow for demolition and debris removal in emergency situations, such authority must be created. This may be accomplished by an order from the local governing executive or by the passing of new ordinances. If such authority must be created by the political subdivisions, we suggest that it be done without including the usual delays for notice and hearing that typically accompany condemnation/demolition laws. This will expedite the cleanup and recovery process. We caution that any such authority should be narrowly tailored to exist only for the purposes of these disasters so as not to threaten the due process rights of the populace after the emergency has abated.
 (3) If local ordinances do exist to allow for demolition and debris removal in emergency situations, then the local authorities, under the analysis contained herein, have the power to bypass the typical due process protections in the interest of saving their communities from hazards, disease, and economic devastation.
 (4) Relaxing due process requirements under exigent circumstances does not run afoul of FEMA guidelines and requirements.
 (5) Once the emergency situation abates, the typical due process requirements for condemnation and demolition return to normal.
 (6) This opinion does not serve as a guarantee that the political subdivisions will not be sued by their citizens at a later date for compensation for the taking that is the demolition of their property. We leave the outcome of these situations to the courts to decide.
 (7) Political subdivisions must remain in compliance with local, state, and federal historic preservation laws and rules. Failure to due so may result in jeopardizing reimbursement funds from FEMA and will certainly deal a substantial blow to the economy of South Louisiana when the cleanup process is complete.
In short, we believe that the law is flexible enough to incorporate the suspension of due process for the greater good of the people of South Louisiana. This State is in dire need of fast action to recover from Hurricanes Katrina and Rita. The health and safety of the people depend on the ability of the government to use its vast resources to accomplish the cleanup, even if that means demolishing some structures without providing typical notice and comment period to the private owners. Additionally, to ensure the health and wellbeing of the people of South Louisiana as well as this region's economy, the government must be able to act as quickly as possible in abating the threats to their communities. Only then will *Page 22 
we be able to see South Louisiana recover from these horrible tragedies. However, one thing must be kept in mind in light of this opinion: The due process suspensions discussed herein are not a granting of carte blanche authority for political subdivisions to run roughshod over individuals' due process rights. Rather they are necessary moves to save a state. Any actions done by the political subdivisions must be done in the utmost good faith or the political subdivisions will doubtless be answerable for a plethora of lawsuits following their actions and they may, indeed, jeopardize their FEMA reimbursements for these actions.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By: _______________________ RYAN M. SEIDEMANN MEGAN K. TERRELL CHRISTOPHER D. MATCHETT Assistant Attorneys General
[1] Similar power exists for municipal chief executive officers under La. R.S. 29:737.